IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TERRILYN BENNETT, SPECIAL ADMINISTRATOR OF THE ESTATE OF DONALD BENNETT, DECEASED, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | Case No. 03 C 4051 |
| UNITED STATES OF AMERICA, | ) ) | HONORABLE CHARLES R. NORGLE |
| Defendant. | ) ) ) | |

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

### I. INTRODUCTION

This case arises out of a surgical operation performed on decedent Donald Bennett ("Bennett") on February 26, 2001 by Dr. Stephen Ondra ("Ondra") at the Lakeside Veterans Administration Hospital ("VA Hospital"). Plaintiff Terrilyn Bennett ("Terrilyn"), brought this action as the administrator of Bennett's estate, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346, alleging that the VA Hospital failed to properly diagnose, treat, and perform the proper surgery on Bennett. Counsel submitted, and the court reviewed, pretrial proposed findings of fact and conclusions of law. The court then conducted a bench trial from March 14, 2005 through March 17, 2005. The court heard evidence from both parties, and entered an Order asking the parties to submit post trial findings of fact and conclusions of law. Based on the totality of the evidence, the court adopts the following findings of fact and conclusions of law.

1

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Facts Relating to Parties And Relationships

Nikki Buckman ("Buckman") met Bennett in 1991 and they remained together for 13 years until his death. (Buckman Tr. 11, 13, 48). All during this time, Bennett was separated from his wife and had four grown children. (Buckman Tr. 11).

At various times, Buckman and Bennett lived in New York, Europe and Chicago. (Buckman Tr. 13, 15, 16).

According to Buckman, Bennett was a heavy smoker until 1999, when he stopped. (Buckman Tr. 43).

Buckman's testimony included details of Bennett's musical career and his physical ailments. (Buckman Tr. 14, 16, 18, 19).

Buckman testified that Bennett was just beginning to focus on his music career in 1991. (Buckman Tr. 13).

In the years they lived in Chicago, Bennett worked part time at a music store and part time as a security guard. (Buckman Tr. 15).

In 2000, Bennett's chronic neck pain was getting to the point he was asking for help and willing to go through surgery. (Buckman Tr. 45, 46). Buckman testified that Bennett was concerned that his pain might impact his piano playing. (Buckman Tr. 21). But, according to her, his physical ailments never stopped him from playing the piano. (Buckman Tr. 19).

In 2004, after Bennett's death, Buckman told Dr. Deutsch that aspects of their relationship facilitated his death. (Jt. Ex. 2, p. A-162).

Leslie Lamb ("Lamb") testified as a friend of Bennett's and as a former employer. (Lamb Tr.

55, 58, 59, 60, 61, 62).

During the relevant years, Lamb owned Metropolitan Chicago Services, which was a security firm in Chicago. (Lamb Tr. 54).

Bennett worked part time on and off for Lamb between the years 1996 and 2001, after Bennett returned from Europe. (Lamb Tr. 58).

Lamb testified that if Bennett would have worked for him full time in 2001, 2002 and 2003, then he would have made between $37,000 - $45,000/year in salary. (Pl. Ex. 19A; Lamb Tr. 61, 62). Lamb confirmed Bennett's sporadic income in 1998 and 2000. (Pl. Ex. 19A)

Lamb was aware of Bennett's physical problems and numerous complaints of neck and back pain. (Lamb Tr. 60-61).

Jacqueline Deutsch ("Dr. Deutsch") is a licensed Doctor of Osteopathic Medicine. She currently works as a non-board certified general psychiatrist at the Department of Veterans Affairs. (Deutsch Tr. 70, 98).

Dr. Deutsch first treated Bennett on February 26, 2001, approximately nine months after he had his first surgery[1] until his death. (Deutsch Tr. 98). Her treatment was basically "talk therapy" and the recommendation of medications. (Deutsch Tr. 98, 99).

In 2001, Dr. Deutsch strongly recommended medications, but Bennett refused to take them. (Deutsch Tr. 99). At this time, Bennett was very preoccupied with pain. (Deutsch Tr. 81). Dr. Deutsch admitted that it was more difficult to treat Bennett without the medication. (Deutsch Tr. 101).

Dr. Deutsch testified that she believed the first surgery triggered post traumatic stress disorder ("PTSD") from Bennett's earlier experiences in life, which she said was very common. (Deutsch Tr.

---

[1] Bennett's surgery on February 26, 2001 at the VA will be referred to as his "first" surgery.

82).

Bennett did not want Dr. Deutsch involved with contacting his surgeons or even looking at his x-rays. (Deutsch Tr. 87). She stated that no law would have prohibited her from talking to his other doctors. (Deutsch Tr. 103).

Dr. Deutsch eventually put Bennett on medications to stabilize his moods (Depakote), for his anxiety (Buspar), and to help him sleep (Temazepam and Seroquel). She also gave him an antidepressant (Prozac). (Deutsch Tr. 90; Jt. Ex. 2, p. A-60).

Although she testified Bennett was a compliant patient (Deutsch Tr. 92), Bennett did not accept Dr. Deutsch's recommendations for medication until September 2002, approximately six months after his second surgery. (Deutsch Tr. 93, 94).

Bennett's sense of hopelessness occurred approximately four months after his second surgery. (Deutsch Tr. 94).

All the while Dr. Deutsch was treating him, she was unaware that Bennett had been on a full and permanent disability since 1997 for his degenerative disease. (Deutsch Tr. 94).

Alan Jorge ("Dr. Jorge") testified through his deposition. He attended college at the University of Chicago from 1990 through 1994 with a degree in Biology. He received his medical degree from the University of Chicago Pritzker School of Medicine in 1998. His residency and fellowship were done at Northwestern University between 1998 and 2004, where he rotated at Children's Memorial Hospital, Evanston Hospital and the Lakeside VA Hospital. These years were dedicated to one year of general surgery, five years of neurosurgery, and a complex spine fellowship. (Jorge Dep. 7-11).

During Bennett's surgery, Dr. Jorge was a Northwestern Medical School resident rotating at the

4

Lakeside VA Hospital[2]. (Jorge Dep. 15). He assisted Dr. Ondra in the procedure and wrote the Operation Report from Bennett's surgery, as well as the Informed Consent. (Jorge Dep. 22, 30, 35).

Dr. Jorge rotated out of the VA Hospital sometime after March 26, 2001, shortly after Bennett's surgery. (Jorge Dep. 119).

When he completed his residency and fellowship in 2004, Dr. Jorge returned home to Florida and private practice. (Jorge Dep. 17).

Bernard Bendok ("Dr. Bendok") testified through his deposition. He is a neurovascular surgeon and assistant professor of neurosurgery and radiology at Northwestern Medical Faculty Foundation. He specializes in microsurgery and endovascular techniques to treat vascular disease of the brain and spinal cord, interventional techniques to treat compression fractures of the spine and general neurosurgery. (Bendok Dep. 7).

He attended Wayne State University, where he received his degree in Biology, Summa Cum Laude, in 1991. His medical degree was conferred by Northwestern University in 1995. Dr. Bendok spent his internship, residency and neuroendovascular fellowship at Northwestern University. He served an additional neuroendovascular surgery fellowship from 2001 - 2003 at State University of New York at Buffalo. He is listed in Who's Who in Medicine and Healthcare (2004-2005). (Bendok Dep. 4).

Dr. Bendok was Dr. Ondra's chief resident at the time of Bennett's first surgery. (Bendok Dep. 8).

Stephen Ondra ("Dr. Ondra") testified in court. He was the attending neurosurgeon who primarily performed the surgical procedure on Bennett on February 26, 2001. (Ondra Tr. 256). He

---

[2] The VA Hospital is connected to the Northwestern campus by a sky bridge, and the residents are interchangeable. It is considered one big hospital. (Jorge Dep. 12-13)

received his board certification in neurosurgery in 1994. (Def. Ex. B, p.5).

He attended West Point Military Academy from 1975 - 1978, received his undergraduate degree from Illinois Wesleyan University in 1980, and his medical degree from Rush Medical College in 1984. His surgical internship was at Walter Reed Army Medical Center from 1984-1985, along with a neurosurgical residency from 1985-1990, also at Walter Reed. Dr. Ondra was a staff neurosurgeon and assistant professor of neurosurgery at Walter Reed from 1991-1994. (Def. Ex. B). His military decorations include the Bronze Star Medal, Desert Storm Medal, Desert Shield Medal, and National Defense Medal. (Def. Ex. B, p.2).

Academic appointments include Director of Skull Base Surgery at Walter Reed from 1991-1994, Director of Complex Spine Surgery at Walter Reed from 1993-1994, Clinical Faculty at University of Michigan, Division of Neurosurgery from 1994-1996, and Assistant Professor of Neurological Surgery at Northwestern from 1996-2000. (Def. Ex. B, p.2).

Presently, he is the Executive Director of Northwestern/HealthSOUTH Back and Neck Institute at Northwestern Memorial Hospital. He has held that position since 1998. (Def. Ex. B, p.3). He is also Vice Chair of the Department of Neurological Surgery, Residency Program Director at Northwestern, and Medical Director of the Neuro Spine Intensive Care Unit at Northwestern. (Def. Ex. B, p.4).

Dr. Ondra has numerous teaching activities and invited lectures in the area of neurosurgery, along with 32 publications, 12 book chapters, seven editorial positions, and 56 medical presentations throughout the world. (Def. Ex. B, p. 6-20).

Although he testified as a fact witness, Dr. Ondra is also a world renown expert neurosurgeon in his own right. The court aptly recognized his expertise. (Ondra Tr. 236, 244, 245, 247, 248 ). The

court found a sufficient foundation consistent with <u>Daubert</u> regarding Dr. Ondra's qualifications. (Court Tr. 238).

In addition, he is considered one of the best neurosurgeons in the world. (Ondra Tr. 210). He was personally asked by the White House to operate on the Secretary of Transportation. (Ondra Tr. 209). He is the Chair of the Anterior Cervical Dissection, Plating Hands-On Lab at the Bethesda Spine and Peripheral Nerve Workshop which teaches spinal techniques and management, the exact technique he used in this case. (Ondra Tr. 205-206).

Dr. Ondra basically sets the standard of care for neurosurgery. (Ondra Tr. 208-09). He has performed hundreds of corpectomies and cervical fusions in his medical career. (Ondra Tr. 211). At one point, plaintiff's attorney gratuitously informed Dr. Ondra that no doctor in this case was challenging his expertise in his field. (Ondra Tr. 257).

John Brayton ("Dr. Brayton") testified through his deposition. He was Bennett's private surgeon. He received his medical degree from Northwestern University Medical School in 1990 and specializes in neurosurgery. (Pl. Ex.1; Brayton Dep. 6). He was an assistant professor at University of Iowa Hospitals until 1997 when he left to begin private practice in the western suburbs of Chicago. (Brayton Dep. 6).

Currently, he practices as a general neurosurgeon, including the surgical management of diseases of the brain, spinal cord and peripheral nerves. (Brayton Dep. 7).

He holds no academic positions and is affiliated with Edward Hospital and Delnor Community Hospital. (Brayton Dep. 7).

He has performed approximately 1500 cervical surgeries. (Brayton Dep. 9).

Dr. Brayton first saw Bennett on February 25, 2002, about one year after his first surgery.

7

(Brayton Dep. 24)  He performed surgery on Bennett on March 26, 2002.[3]  (Brayton Dep. 37).

He is a former partner of plaintiff's expert witness, Dr. Skaletsky. (Skaletsky Tr. 172).

Dr. Gary Skaletsky ("Dr. Skaletsky") testified as an expert witness for plaintiff.  In 1984, he became board certified in the area of neurosurgery. (Pl. Ex. 29).  He has been licensed as a medical doctor since 1976.  Dr. Skaletsky does not currently perform surgery and hasn't since before Bennett's first surgery because he has bone spurs at C5-6 and C6-7, which cause him to develop numbness and weakness in his left arm.  (Skaletsky Tr. 118).  He has had no hospital affiliations since 2001. (Skaletsky Tr. 171).  His practice consists of all non-surgical patients. (Skaletsky Tr. 118).

Dr. Skaletsky has no publications and spends 20% of his time reviewing medical-legal cases. He charges $750/hour.  He has paid out more than $1,000,000 in malpractice judgments against him.[4] (Skaletsky Tr. 171).

Dr. Skaletsky reviewed all of Bennett's medical records  (Slaketsky Tr. 119).  Skaletsky drafted a report, which he wrote before he read the depositions of the treating physicians – Dr. Ondra, Dr. Jorge, and Dr. Bendok – or Dr. Penn. (Pl. Ex. 30; Skaletsky Tr. 172, 173).  Dr. Skaletsky testified that nothing in his report was impacted by anything those doctors said.  (Skaletsky Tr. 173).

Dr. Richard Penn ("Dr. Penn") testified as an expert witness on behalf of the United States. The court gave great weight to the testimony of Dr. Penn.  He is a highly qualified physician with many years of experience.  Dr. Penn is a board certified neurosurgeon and has been since 1976.  (Def. Ex. C; Penn Tr. 336).  He received his medical degree from Columbia University in 1966.  He is a

---

[3] The surgery performed by Dr. Brayton on March 26, 2002 will be referred to as the "second" surgery.

[4] Dr. Skaletsky testified that both Drs. Penn and Ondra have been sued and gotten judgments against them.  (Skaletsky Tr. 185)  Dr. Skaletsky is mistaken because Dr. Penn has had no judgments against him in his career (Penn Tr. 340) and Dr. Ondra's only judgment was for $60,000 for a vessel tear.  (Ondra Tr. 256)

professor of neurosurgery at the University of Chicago Hospitals. (Penn Tr. 336). Prior to that, he was at Rush Presbyterian St. Luke's Hospital for 29 years in the department of neurosurgery. When the Bureau of Medical Devices was looking for experts to review new medical devices for possible FDA approval, Dr. Penn was selected to sit on that board. He was also on a similar board when they looked at new medicines for neurological diseases. (Penn Tr. 336).

Dr. Penn reviewed articles that were being submitted to the Journal of Neurosurgery and decided whether they should be accepted, changed, or rejected. (Penn Tr. 336). He is a Senior Society Member of the Society of Neurological Surgeons which is an elite society based on the amount of academic work that he has done. Dr. Penn has also taught at Georgetown and Rush Presbyterian St. Luke's Hospitals. (Def. Ex. B).

Dr. Penn practices in a specialized area of neurosurgery called functional neurosurgery. (Penn Tr. 340). His current practice also includes surgical procedures. (Penn Tr. 342). He takes care of patients with movement disorders, spasticity[5] and pain. (Penn Tr. 340). Dr. Penn has done similar surgeries like the one performed on Bennett. (Penn Tr. 341). He estimates that he has done somewhere between 20 and 30 cervical fusions a year in his career, including his residency. Ironically, in the early 1990's, Dr. Penn was chosen to scrub with the surgeon who invented this same anterior cervical fusion procedure. (Penn Tr. 341, 341). He has not been involved in the instrumentation in these procedures. (Penn Tr. 342).

He devotes a substantial amount of his time to research and has solicited millions of dollars from the government or private companies to support the type of research that he has been doing in neurosurgery over the last 30 years. (Penn Tr. 337-338). Dr. Penn has 127 peer-reviewed

---

[5] Spasticity is a problem that occurs after the nervous system has been damaged, particularly in spinal cord patients. (Penn. Tr. 340).

9

publications, as well as books and book chapters all in the field of neurosurgery or neuroscience. (Def. Ex. B). In 1982, he was the first neurosurgeon to use a programmable implanted pump to give morphine to the nervous system directly. (Penn Tr. 338-339). He invented a technique of giving low does of pain medicine to the spinal cord for spasticity. (Penn Tr. 339).

Dr. Penn has testified both for and against the government. (Penn Tr. 339). He charges $350 for expert review and testimony. (Penn Tr. 340). He has never had a judgment against him in a medical negligence case, although one case was settled. (Penn Tr. 340).

Dr. Penn reviewed all of Bennett's medical records, films, reports and depositions in this case and authored a report. (Penn Tr. 342-343; Def. Ex. D). Dr. Penn, testified that the VA doctors and staff did not chart anywhere in the medical record that they discussed alternative surgical procedures with Don Bennett. (T.p.415-416). Dr. Penn testified that there is no medical record detailing any discussion of conservative treatment between the neurosurgical staff and Don Bennett prior to the decision to have Don Bennett undergo surgery. (T.p. 400-402).

## B. Standard of Care

Plaintiff, in order to prevail, must establish by a preponderance of the evidence each element for medical malpractice under Illinois law. Plaintiff must prove by expert testimony, the standard of care applicable, that a deviation from such standard of care constitutes negligence, and that the deviation was the proximate cause of Bennett's injuries.

### 1. Prior Medical Status

Bennett first came to the Lakeside VA Clinic in 2000 with complaints of neck and back pain. (Jt. Ex. 2, p. 2). Bennett's pain had been constant for the past 20 years; it was getting progressively worse and he was experiencing tingling and numbness in his hands. (Jt. Ex. 2, p. 24; Penn Tr. 353, 354).

Bennett suffered from severe degenerative joint disease ("DJD") and in 1997 he was put on a full and permanent VA disability. (Penn Tr. 395; Buckman Tr. 46).

His medical history included COPD, emphysema, diabetes and obesity. (Jt. Ex. 2). He suffered a self-inflicted gunshot wound in 1976 due to his drinking at that time. (Deutsch Tr. 79-80).

Bennett was hospitalized at least two times while living in Europe between 1993 and 1996 due to his unrelated respiratory problems. (Jt. Ex. 2, p. 24; Penn Tr. 354).

Prior to the first surgery, Bennett had difficulty with his wrist extension and reaching. (Jt. Ex. 2, p.2). Since he was a piano player, this was getting him into trouble. *Id.*

Bennett also had left and right deltoid weakness and biceps before the first surgery. (Jorge Tr. 46; Ondra Tr. 252; Penn Tr. 350-352). He was unable to lie flat (Jt. Ex. 2, p. 2) and had difficulty sleeping. (Jt. Ex. 2, p. 35).

### 2. *Plaintiff's Allegations*

According to Dr. Skaletsky's Report, the United States through its agents, Drs. Ondra, Jorge and Bendok, committed the following negligent acts:

(a) failed to manage Bennett conservatively for one year prior to surgery with treatment such as physical therapy, anti-inflammatory medication or mild analgesics, or perhaps epidural steroid injections, though at trial he testified lack of steroid injections would not be a breach of the standard of care. (Skaletsky Tr. 175). He also believes there should have been a thorough assessment of Bennett's pulmonary status by the neurological service prior to the first surgery (Pl. Ex. 30, p 5; Skaletsky Tr. 173, 174);

(b) failed to recognize Bennett was not a good surgical candidate (Pl. Ex. 30, p. 5);

(c) failed to perform the corpectomy as dictated in Dr. Jorge's Operation Report (Pl. Ex. 30, p. 5);

11

(d) violated the intra-operative standard of care regarding the operative technique and the failure to recognize and treat malignant hyperthermia during the surgery. Dr. Skaletsky takes issue with the "mystery" of the malignant hyperthermia since he claims it does not appear in the anesthesia record or the operative summary, but instead shows up in a "minor addendum" (Pl. Ex. 30, p. 6); and

(e) failed to manage Bennett's post-operative care. (Pl. Ex. 30, p. 6).

The February 26, 2001 surgery started at 8:30 a.m. when anesthesia began. The incision in Mr. Bennett's neck took place at 10:20 a.m. During the operation, Mr. Bennett's physical condition became compromised at approximately 3:45 p.m. and anesthesia started to administer the drug dantrolene to reverse the effects of the suspected malignant hyperthermia. Mr. Bennett was believed to have experienced an episode of suspected malignant hyperthermia, but when tested before his 2002 revision surgery, it was determined that he never had malignant hyperthermia. (Admitted Fact by the Government in the Final Pre-Trial Order). The operation ended at 5:35 p.m. and anesthesia ended at 6:45 p.m. (T.p.126-127; Joint Ex. 2 p. 100-102, 136-138).

Dr. Bendok did not remember or recall that Don Bennett's surgery involved an episode of malignant hyperthermia and that event is something that he would have remembered if it had happened while he was in the operating room. (Bendok Dep. p.27-28, 32-33).

During the February 26, 2001 surgery, Dr. Jorge charted that he removed the posterior longitudal ligament. (Jorge Dep. p.40-46; 128; Joint Exhibit 2 p. 137).

During the February 26, 2001 surgery, the VA doctors did not monitor the somatosensory evoked potential (SSEP) to continually assess the integrity of neutral pathways at risk during spinal cord surgery. (Admitted Fact by the Government in the Final Pre-Trial Order).

The VA doctors did not perform the surgery for which Donald Bennett provided consent, ie. C4-C7 fusion. (Joint Exhibit 2 p. 136-138, 173, 221, 302, 304). The VA doctors only performed a C4-C6 fusion and they did not complete the diskectomy to the C6-C7 disc. (Jorge Dep. p.116, 118).

The surgical procedure described by Dr. Jorge is performed from the front, but Mr. Bennett had an unexplained scar on the back of his neck. (Admitted Fact by the Government in the Final Pre-Trial Order; Joint Ex. 2 p. 310; Pltf's Exs. 13-15 and 31).

Based on the depositions of Dr. Ondra, Dr. Bendok, Dr. Jorge, Dr. Penn and Dr. Skaletsky's own experience, a C5 corpectomy with a C4-6 fusion should be completed within approximately four hours. (T.p.127; Bendok Dep. p.29-30; Jorge Dep. P. 86). Dr. Penn, the Government's expert witness, testified that there is nothing in the medical records that indicates why Don Bennett's February 26, 2001 surgery lasted nearly 10 hours. (T.p.377). Dr. Penn is unaware of any inefficiency at the Lakeside VA Hospital that slowed Don Bennett's surgery down. (T.p.378).

According to Dr. Ondra, the procedure varies depending upon the size of the patient's neck, whether the procedure is being performed in a teaching setting, and how fast x-rays can be taken and developed. (Ondra Tr. 223). Bennett's neck was quite large, short and round; this would add time to the procedure. (Pl. Ex. 3; Ondra Tr. 226-227). Dr. Ondra testified that there is more to do than simply putting a patient to sleep prior to the first incision; lines are inserted, catheters are placed, etc. (Ondra Tr. 289). He said it can take 1-2 hours once the patient is asleep to even be ready to begin surgery. (Ondra Tr. 289) Dr. Penn agreed. (Penn Tr. 384, 386-387). Here, Bennett was started on sedation at 8:45 AM and was first incised at 10:20 AM. (Ondra Tr. 289). X-rays are taken once the vertebrae are exposed. (Ondra Tr. 290). This wasn't until 1:08 PM. (Ondra Tr. 295). According to Dr. Ondra, making the incision alone could easily have taken a couple of hours due to the size of Bennett's neck. (Ondra Tr. 292; Pl. Ex. 3).

Dr. Ondra testified that if he was performing Don Bennett's surgery by himself on a patient with a large neck, it would take four hours to complete. (T.p.223).

Dr. Ondra testified that after the treatment for the malignant hyperthermia had begun, that the surgery continued for over two more hours. (T.p.298). During that two hours, Dr. Ondra testified that he completed the corpectomy, decompressed the nerves, placed a graft, got a plate, placed that plate, and closed in whatever fashion. (T.p.298-299). However, during Dr. Ondra's deposition, he testified that he was not sure exactly what he performed in Don Bennett's February 26, 2001 surgery. (T.p.300).

Dr. Bendok does not recall ever being in a case at the VA like this case where the surgery took 10 hours. (Bendok Dep. p.31-33).

Dr. Ondra testified that he probably was not present for the entire procedure performed on Don Bennett on February 26, 2001. (T.p.217, 292-293). Dr. Ondra testified that he did not know or was not sure if he was in the operating room the entire time of the procedure. (T.p.258). According to the February 26, 2001 surgery schedule at Northwestern Hospital, Dr. Ondra was in surgery at Northwestern from 7:30 a.m. to 9:40 a.m. (T.p.166-168; Pltf Ex. 26).

Dr. Ondra testified that the operating room "is the only place on Earth I'm the absolute dictator. They have to do what I want them to do, and it has to be the way I would do it or I'm going to do it." (T.p.218). Dr. Ondra considers himself one of the best neurosurgeons in the "world." (T.p.210).

Although not mentioned in his report, Dr. Skaletsky testified that the length of time Bennett was under anesthesia would have affected his COPD, or increased the risk of malignant hyperthermia. (Skaletsky Tr. 182-83). Also not included in his report, but brought up in his testimony, were allegations of sloppy record keeping and the doctors' noncompliance with the VA Hospital Handbook. (Skaletsky Tr. 183).

14

At trial, Dr. Skaletsky testified that Bennett should have had six weeks of conservative treatment prior to the first surgery. (Skaletsky Tr. 173). But, the evidence clearly shows that Bennett was a patient at the Lakeside VA Hospital Pain Clinic for the purpose of receiving care and treatment relating to pain he was experiencing in his neck for approximately one year prior to the surgery. (Ondra Tr. 212,13; Skaletsky Tr. 121; Jt. Ex. 2, p. 3, 4, 5, 8, 9, 11, 12, 24). The care and treatment that Bennett received consisted of steroid injections, an anti-inflammatory, heat, exercises, stimulation, and TENS unit therapy, all with no permanent relief. (Jt. Ex. 2, p. 37; Penn Tr. 354). Bennett was very interested in pursuing surgery. (Jt. Ex. 2, p. 32). Without a doubt, Bennett received over one year of conservative treatment, thus contradicting Dr. Skaletsky's allegation. This is not a case where a patient was rushed to surgery. (Penn Tr. 405). This is simply a careless allegation on plaintiff's part.

Next, Dr. Skaletsky faults the neurological service for failing to perform a thorough assessment of Bennett's pulmonary status. All of the experts agree that it is the Anesthesiology Service that clears patients for surgery, as was the case here. (Ondra Tr. 253; Penn Tr. 347; Skaletsky Tr. 184). They are the service that assesses respiratory function in order to determine a patient's eligibility for surgery. There was a complete pre-anesthetic evaluation performed on Bennett on February 25, 2001. (Jt. Ex. 2, p. 111).

Dr. Skaletsky opined within a reasonable degree of medical certainty that portions of the surgery described in the operative report of the February 26, 2001 surgery were not performed, such as the complete removal of the vertebral body of C5 , the removal of the posterior longitudal ligament and the C6-C7 diskectomy and fusion to the C7 level. Dr. Skaletsky based his opinion on the post-operative studies of the cervical spine and the operative report of Dr. Brayton that there was significant residual C5 vertebral body and intact posterior longitudinal ligament, both of which were causing compression of the spinal cord. (T.p.133-134; Pltf's Ex.30). According to the operative summary

15

dictated by Dr. Jorge, the remaining C5 vertebral body material and posterior longitudal ligament immediately behind the C5 vertebral body were not supposed to be there. (T.p.134; Joint Ex. 2 p.136-138).

Dr. Skaletsky provided an opinion that there was a deviation from the standard of care in the performance of the February 26, 2001 operation. Dr. Skaletsky opined that based upon the objective diagnostic studies performed post-operatively and the intra-operative findings made by Dr. Brayton at the 2002 surgery, "a corpectomy had not been performed in the manner in which it was described in the literature and that is required by neurosurgery standard of care; that the removal of the posterior longitudal ligament had not been performed, again, as required by that standard of care and in the literature; and that the spinal cord was not decompressed, which is a violation of the standard of care when one goes into an operating room in order to decompress the spinal cord." (T.p.159). As a result of the breaches of the standard of care, Don Bennett was caused to suffer a progressive neurologic deficit, deterioration of his neurologic status, failure of fusion, unnecessary pain, kyphosis and the need for another surgery to attempt to correct those deficiencies. (T.p.159-160). The deviation from the standard of care in the February 26, 2001 operation caused Don Bennett to have neurological problems in his hands which caused him to be unable to play the piano and to have additional problems with his COPD. (T.p.160-161; Pltf's Ex. 30).

Dr. Skaletsky opined that for someone like Don Bennett who has COPD, he was under anesthesia for an exceptionally long time. Nothing in the operative report indicates that there were any problems or extraordinary circumstances during the surgery which caused the surgery to be extended to almost 10 hours. (T.p.152-153; Jorge Dep. p. 86).

Dr. Skaletsky has seen other patients who have had cervical diskectomies and fusions performed by Dr. Ondra and Don Bennett's results were not typical of Dr. Ondra's surgical results.

16

Therefore, Dr. Skaletsky opined that Dr. Ondra was, more likely than not, not the surgeon that fully performed the surgery on Don Bennett. (T.p.186).

Even though the medical reports indicate that certain procedures were eliminated from the February 26, 2001 surgery, nothing in the operative report from that surgery indicates that anything was eliminated. (T.p.189; Joint Ex. 2 p.136-138).

Based on the records and the conversation between Dr. Jorge and Nikki Buckman, Dr. Skaletsky opined that these facts were consistent with Dr. Ondra coming to the surgery after the diagnosis of malignant hyperthermia to complete the surgery and that he was not there for the entire procedure. (T.p.191-192).

Dr. Skaletsky's next criticism is that the United States failed to perform the corpectomy as dictated in Dr. Jorge's Operation Report. There can be no question that Bennett experienced what the Anesthesiology Service believed to be malignant hyperthermia. Everyone has agreed that malignant hyperthermia is an absolutely life threatening complication. (Ondra Tr. 224; Penn Tr. 357; Skaletsky Tr. 176). Dr. Skaletsky called it "devastating." (Skaletsky Tr. 176). In fact, 80% of patients who develop malignant hyperthermia die. (Penn Tr. 357). However, the surgeons do not create malignant hyperthermia nor do they treat the problem. Once malignant hyperthermia is diagnosed, the anesthesiologists tell the surgeons of the problem and then treat it, not the other way around. (Skaletsky Tr. 176). There is not a debate, and no surgeon would argue with an anesthesiologist's diagnosis. (Skaletsky Tr. 176).

Dr. Jorge testified that in the middle of the surgery, Anesthesia reported that Bennett was having what they thought was malignant hyperthermia and were actively treating him for this by bringing in ice bags. (Jorge Tr. 26, 28). Dr. Jorge had never seen temperatures as high as Bennett's. (Jorge Tr. 105). When Dr. Ondra was informed of the threat of malignant hyperthermia, he had to

17

decide whether he would leave Bennett with partial loss of vertebral body and return at a later date, or determine if Bennett was stable enough to complete a reasonable stabilizing decompression procedure. (Ondra Tr. 224). The C6-7 portion of the procedure was aborted when Bennett developed the malignant hyperthermia. (Ondra Tr. 230, 311). Buckman testified that Dr. Jorge told her immediately after the surgery that the operation could not be completed as planned. (Buckman Tr. 23).

There was substantial testimony about the length of the first surgery. Although not mentioned in Dr. Skaletsky's original report (Skaletsky Tr. 182), plaintiff's expert, Dr. Skaletsky, alleges that the extreme length of the procedure caused much harm to Bennett. Dr. Jorge testified that it was not unreasonable for anesthesia to begin at 8:30 and the operation to begin two hours later. (Jorge Dep. 85). In fact, he has done similar procedures. (Jorge Dep. 86).

Dr. Penn testified that it was not an exceptional length of time for this type of surgery. (Penn Tr. 356). He noted that university settings tend to take longer and stressed that the procedure is not a contest in rushing. (Penn Tr. 356). He believes, however, patients get better care in teaching hospitals. (Penn Tr. 374). The malignant hyperthermia undoubtedly complicated the case, and Bennett's neck was large. As Dr. Penn stated, "no one was out having coffee during this procedure." (Penn Tr. 384-385, 357).

Under ideal circumstances, the surgical time would have been approximately 3-4 hours. But, sometimes it can take three hours, sometimes it can take six hours. However, Dr. Penn testified that the time frame in question is in the same range as the University of Chicago with an obese patient such as Bennett. (Penn Tr. 375, 436; P. Ex. 3).

The presumed malignant hyperthermia was determined at 3:45 PM. (Ondra Tr. 297). But that's not when the problem started. Ondra testified that the anesthesiologists don't immediately look at a problem and start administering drugs; there are a series of assessments to be made first. (Ondra

18

Tr. 298). Bennett's temperature started rising gradually around 12:00 - 1:00 PM. (Penn Tr. 358). During that time, the anesthesiologists were giving him medications and trying to control the malignant hyperthermia – packing ice – so as to stabilize Bennett and complete the operation. (Ondra Tr. 298).

While Dr. Jorge distinctly remembers the malignant hyperthermia episode, he had minimal hands-on involvement and no independent recollection of the details of the operation. (Jorge Dep. 27, 42). He does remember Dr. Ondra taking over completely. (Jorge Dep. 26, 27; Ondra Tr. 278).

Dr. Ondra clearly recalls the unusual issue of malignant hyperthermia. (Ondra Tr. 223). And, he clearly recalls he took over the procedure very early on when Bennett's medical instability was reported by the anesthetist. (Ondra Tr. 261, 266). It is clear from the medical records, as well as all the testimony on the subject, that Dr. Ondra completely took over the procedure once the threat of malignant hyperthermia was identified. (Ondra Tr. 261, 266; Jorge Dep. 26-27; Buckman Tr. 24 ; Jt. Ex. 2, p.138). Dr. Ondra testified that residents don't independently operate; the attending physicians perform the actual surgery and that in this case he performed the bulk of the procedures. (Ondra Tr. 212). He described himself as an "absolute dictator" in the Operating Room; he is either performing or supervising the entire time. (Ondra Tr. 218). In Dr. Ondra's opinion, this surgery quickly became an "attending-only" case and not a teaching case. (Ondra Tr. 250). Dr. Ondra freely admitted that "the buck stops with me" and fully intends to be accountable for the entire surgical procedure. (Ondra Tr. 212). However, he did not participate in any followup care for Bennett, who would have been seen at the VA Clinic by a resident and a different attending. (Ondra Tr. 279).

Immediately post-surgery, Dr. Skaletsky agreed that Bennett's films confirmed everything was intact physiologically. (Skaletsky Tr. 177-78) On March 26, 2001, all of the surgical instrumentation was intact. (Skaletsky Tr. 178; Ondra Tr. 233, 234; Jt. Ex. 3A and 3E).

After the first surgery, Bennett had a stable construct on film; on physical exam, he had no clonus, Babinski or Hoffman's signs which would have indicated post-surgical problems. (Ondra Tr. 239, 278; Jt. Ex. 2, p. 278). During this time, Dr. Ondra felt the graft was properly located and mechanically sound. (Ondra Tr. 231).

Plaintiff argues that when Bennett was dropping things in April 2001, it was a clue to his future problems. The findings of the EMG showed a problem with different nerves; it showed bilateral carpal tunnel disease. (Penn Tr. 363). This would explain Bennett's dropping things. (Ondra Tr. 240, 241; Penn Tr. 363, 409). We now know, in retrospect, that the fusion had failed and a screw had backed out from Bennett's cervical plate. (Ondra Tr. 242).

Buckman testified that Bennett had been a heavy smoker until 1999, when he allegedly stopped. (Buckman, Tr. 43.) The contemporaneous medical records challenge her testimony. They indicate that years later, Bennett was still being encouraged and ordered to quit smoking. (Jt. Ex. 2, p. 2, 16, 41, 394, 437, 438, 439, 596) Bennett was repeatedly counseled by VA physicians to stop due to his need for oxygen, his COPD, and other respiratory problems. Id.

## C. Proximate Cause

As a direct and proximate result of the Defendant's and its agent's negligence, Mr. Bennett suffered injuries consisting of loss of normal life, extreme pain and suffering, loss of function in his extremities, emotional distress, aggravation of his post traumatic stress disorder, disfigurement, medical expenses and economic damages.

Dr. Skaletsky opines that all of Bennett's problems – kyphotic deformity, dysphagia, and the onset and progression of cervical myeloradiculopathy – were caused by the VA's violations of the standard of care. (Pl. Ex. 30, p. 7). Dr. Skaletsky believes the first surgery itself caused Bennett's second surgery. Both Drs. Penn and Ondra disagreed and testified that the initial procedure did not

"cause" the second surgery, because Bennett would have had to have it regardless since his fusion failed.

## D. Damages

The evidence regarding Bennett's economic damages is controversial, to say the least. Bennett worked for "POPS for Champagne" from 1988-2001 at least four times per year and received $500.00 for each performance. (Pl. Ex. 21). He also performed at the "Green Mill Jazz Club" several times a year since 1986 and received an average of $1,000 per year. (Pl. Ex. 22). Much of this employment occurred during the time Bennett was on permanent 100% government disability.

Between 1996 and 2001, Bennett worked part-time on and off as a security guard for Leslie Lamb. (Lamb, Tr. 58). Lamb knew at the time that Bennett had physical problems and that he voiced numerous complaints about his neck and back pain. (Lamb, Tr. 60, 61). This was also while Bennett was on permanent 100% government disability.

Lamb testified that if Bennett had worked for him full time in 2000, 2001, 2002 and 2003, he would have made $45-50,000/year. But, Bennett never worked full time. He hadn't worked in years and had been on a permanent 100% disability since 1997. Of course, Lamb was unaware that Bennett was receiving total and permanent disability benefits at that time. (Lamb Tr. 65; Ex. 19B). Prior to the first surgery, Bennett tried to work for Lamb but had to leave after one week because of his recurring health problems. (Lamb Tr. 66; Ex. 19A). This potential evidence of lost income was simply wishful thinking on the part of plaintiff.

Bennett received a permanent 100% disability rating from the government in early 1997; he was awarded $700/month in disability benefits. (Buckman Tr. 46). His disability was not service connected, but as a result of years of degenerative disk disease. (Buckman Tr. 46, 47).

21

As far as his music was concerned, although he made several CD's, Bennett was never able to live off the sales of them. (Buckman, Tr. 42).

Bennett's damages are related to pain he suffered. Again, the evidence submitted is unclear. For example, after the first surgery, Buckman testified that Bennett slept in a recliner chair. (Buckman Tr. 28; Ex. 3). But the evidence contradicts her testimony. According to VA medical records, Bennett was unable to lie flat long before his first surgery. (Jt. Ex 2, p.2).

After the first surgery, it took about a month or so before Bennett regained his strength. (Buckman, Tr. 29). According to Buckman, Bennett's problems after the second surgery were mostly pulmonary. (Buckman Tr. 36). Due to his emphysema, Bennett had portable oxygen which he used for the rest of his life. (Buckman, Tr. 48, 49).

Following the second surgery of March 26, 2002, Bennett came functionally close to what he had been before the first surgery. In fact, Buckman testified there was a remarkable change in his posture, he was not in as much pain, could walk better, his appetite improved, and he ha a positive outlook on life. (Buckman Tr. 34, 35).

Bennett suffered a temporary kyphotic deformity. (Skaletsky Tr. 178). It is a bend in the neck which causes pain. (Penn Tr. 421- 422). Kyphosis can occur when there is no negligence. (Skaletsky Tr. 178). It is also a known complication of the type of surgery Bennett, at his request, underwent. (Skaletsky Tr. 178).

Dysphagia and cervical myeloradiculopathy are also complications of this cervical spine surgery and can also occur in the absence of negligence. (Skaletsky Tr. 178-179).

All of the medical witnesses agree that Bennett never suffered any permanent spinal cord injury from either of his surgeries. (Skaletsky Tr. 179; Ondra Tr. 316; Penn Tr. 360, 368). According to Bennett's expert, he suffered a temporary (6 month) kyphotic deformity. (Skaletsky Tr. 177).

22

According to the government's expert, Bennett was a temporary (9 month) kyphotic deformity. (Penn Tr. 425).

## E. CONCLUSIONS OF LAW

The Federal Tort Claims Act ("FTCA") makes the United States liable in tort claims in the same manner and to the same extent as a private individual in like circumstances. 28 U.S.C. § 2674.

An FTCA case is governed by the law of the place where the act or omission occurred. 28 U.S.C. §1346. Therefore, this case is controlled by the law of the State of Illinois. Campbell v. United States, 904 F.2d 1188, 1192 (7th Cir. 1990).

Under Illinois law, a plaintiff in a medical malpractice case must prove (a) the standard of care by which the physician's treatment is measured; (b) a deviation from that standard; and (c) the deviation proximately caused plaintiff's injury. Chambers v. Ingram, 85 F.3d 351, 355 (7th Cir. 1998); Borowski v. Von Solbrig, 328 N.E.2d 301, 305 (Ill. 1975).

Proof of these elements is admitted through expert testimony. Ramos v. Pyati, 534 N.E.2d 472, 475 (Ill.App.Ct. 1989).

Moreover, in Illinois, the standard of care "requires a physician to possess and apply that degree of knowledge, skill and care which a reasonably well-qualified physician in the same or similar community would bring to a similar case under similar circumstances." Campbell, 904 F.2d at 1191.

Whether or not a doctor deviated from the standard of care is a question of fact which must be decided by reference to expert testimony. Campbell, 904 F.2d 1193; Walski v. Tienga, 72 Ill.2d 249, 256; 381 N.E.2d 279, 283 (1978).

In order to sustain the burden of proof, plaintiffs must prove by a preponderance of the evidence that the Lakeside VA Hospital staff failed to comply with the standard of care applicable to their conduct and that this lack of care proximately caused the injury which she claims. Wise v. St.

23

Mary's Hospital, 64 Ill.App. 2d 687, 589; 381 N.E.2d 80 (1978); Borowski v. Von Solbrig, 14 Ill.App.3d 672; 328 N.E.2d 301, *aff'd*, 60 Ill. 2d 418 (1975).

It is insufficient to show merely that an injury occurred; evidence of a bad result does not constitute evidence of lack of skill or negligence.  Crawford v. Anagnostopoulos, 69 Ill.App.3d 954; 387 NE2d 1064 (1979).

Illinois courts have consistently held that proximate cause is not established where the causal connection is "contingent, speculative or merely possible."  Newell v. Corres, 125 Ill.App.3d 1087; 303 N.E.2d 146, 152 (1973); Manion v Brant Oil Co., 85 Ill.App.2d 129; 229 NE 2d 171, 175 (1967).

The standard of care against which a physician's conduct is measured is also not the highest degree of skill possible, but the reasonable skill which a physician in good standing in the community would use under similar circumstances.  Newell v. Corres, 125 Ill.App.3d 1087; 466 N.E.2d 1085, 1089 (1st Dist. 1984).

Where expert testimony demonstrates that alternative methods of treatment are both proper under the circumstances, and a doctor chooses one method over another and an injury results, there still has been no deviation from the standard of care.  Newell v. Corres, 466 N.E.2d 1085, 1089 (Ill.App.Ct. 1984).

The evidence produced at trial clearly demonstrated that the neurosurgical staff at the VA never made an independent assessment as to any conservative treatment for Don Bennett's degenerative disk disease.  While Don Bennett's primary physicians had made limited attempts at conservative treatment, none of the medical records or any of the testimony demonstrated that the neurosurgical staff ever considered a conservative course of treatment for Don Bennett after taking over the care of Don Bennett in January, 2001.  Instead, the evidence clearly shows that a first-year resident, Dr. Jorge, was

given the task of finding surgical patients and to set them up for the operating room. (Dr. Jorge Dep. p. 84) Because Dr. Jorge's assignment was to find surgical candidates in the Emergency Room, conservative treatment of Don Bennett's disc disease was never really an option or even contemplated. Dr. Jorge only had a three month rotation through the VA, January through March, 2001. He found Don Bennett in the emergency room, counseled him on having surgery, and arranged for the surgery to be performed February 26, 2001. Between January 2001 and his surgery, no VA doctors discussed any alternative treatments or surgeries with Don Bennett.

In order to recover, "the injury suffered by plaintiff must be the natural and not merely a remote consequence of the defendant's act." Town of Thornton v. Winterhoff, 406 Ill. 113 (1950).

Dr. Ondra and Dr. Bendok did not recall ever meeting Don Bennett or speaking with him prior to the February 26, 2001 surgery. Dr. Ondra does not recall Don Bennett at all and never met with him. (Admitted Fact by the Government in the Final Pre-Trial Order) Dr. Ondra and Dr. Bendok's failure to meet with Don Bennett or to chart any discussion with Don Bennett violated the VA hospital rules on the supervision of residents by attending physicians. (T. P. 163-166; Pltf's Ex. 27)

Dr. Ondra testified that prior to the February 26, 2001 surgery, he had no direct contact with Don Bennett and that there is no progress note or any note whatsoever in Don Bennett's chart that was actually authored by Dr. Ondra. (T.p.277-278; Joint Ex. 2) As an admitted violation of the VA Handbook, Dr. Ondra never met with Don Bennett, and never charted that he ever met with Don Bennett or even discussed or considered conservative treatment prior to the February 26, 2001 surgery. In fact Dr. Ondra testified that he never read the VA Handbook. (T. P. 251-252) If Dr. Ondra had complied with the directives in the VA Handbook in the supervision of residents, then the type of conservative or alternative treatments identified by Dr. Penn and Dr. Skaletsky more likely than not would have been offered to Don Bennett instead of the surgery he underwent on February 26, 2001.

Dr. Ondra testified that if Don Bennett had not undergone the surgery on February 26, 2001, then he never would have experienced the problems, complications, pain, suffering, and a revision surgery. (T. p. 305-306)

Moreover, Dr. Skaletsky, the Plaintiff's expert, testified that the VA doctors breached the standard of care owed to Don Bennett preoperatively when they failed to provide conservative treatment options and failed to provide alternative surgical options to Don Bennett. Dr. Skaletsky gave an opinion that the preoperative care of Mr. Bennett was a violation of the appropriate standard of care for a patient in Don Bennett's condition. Dr. Skaletsky specifically opined that without a progressive neurologic deficit, that is, progressive weakness of arms or legs or loss of bowel or bladder control, a trial of conservative management was the appropriate treatment to be undertaken, especially for a person with so many other medical conditions. (Pltf's Ex. 30). That conservative course of treatment was mandatory and was not done. Also, a thorough assessment of his pulmonary status had never been undertaken in an effort to minimize the risks to his breathing abilities post-operatively. (T.p.157-158).

Dr. Penn, the Government's expert witness, testified that the VA doctors and staff did not chart anywhere in the medical record that they discussed alternative surgical procedures with Don Bennett. (T.p.415-416). It was a violation of the standard of care to subject a high-risk patient like Donald Bennett to an extensive operative procedure, which was clearly elective in its nature, without a trial of conservative management. This pre-operative management (or, more precisely, the lack of same) was a violation of the standard of care and was committed by the neurosurgical service at Lakeside VA Hospital.

While hospital bylaws and regulations are admissible as evidence of negligence, they do not conclusively establish the standard of care. "Rather, such regulations are only part of the evidence to be considered by the [fact finder]. A plaintiff must prove not only the violation of the

bylaws, but that such violation proximately caused the injury to the plaintiff." Pardy v. United States of America, 783 F. 2d 710, 715 n.3 (7th Cir. 1986).

The doctors and staff at the Lakeside VA Hospital were negligent in the care and treatment of Donald Bennett when they negligently failed to provide informed consent and advice regarding alternative conservative treatment and alternative surgical procedures prior to surgical intervention. Dr. Penn opined that the parts of the surgery that were not done were that the surgeons "probably would have taken off a little bit more bone, and they may well have done another level worth of decompression, which is what they [were] getting permission to do on [the] informed consent. (T.p.413).

Dr. Penn testified that neither Dr. Ondra, Dr. Bendok nor Dr. Jorge ever asked or requested that Don Bennett return to the VA to complete those portions of the surgery that were not completed. (T.p.413-414). The VA charted that Don Bennett needed to see a neurosurgeon as early as April 9, 2001. (Joint Ex. 2 p. 305).

As a proximate cause of these breaches of the standard of care, pre-operatively, which is evidenced by the VA doctors' failure to comply with the VA Handbook, Don Bennett suffered the injuries related to the first surgery as well as having to undergo a second surgery to complete what was not done in the first surgery. As a result of these breaches of the standard of care, pre-operatively, Don Bennett is entitled to the damages stated below:

| | |
|---|---|
| Loss of normal life | $ 0.00 |
| Pain and Suffering | $ 230,000.00 |
| Emotional Distress | $ 10,000.00 |
| Medical Expenses | $ 124,361.81 |
| Lost Earnings | $ 9,000.00 |
| Aggravation of Plaintiff's PTSD | $ 0.00 |
| Total | $373,361.81 |

27

It is the plaintiff's burden to prove with reasonable certainty, the amount of damages alleged. Viewed in totality of the evidence, the court, as the finder of fact, finds that Lamb's testimony in regards to Bennett's future employment was unpersuasive. Lamb stated that he "would have paid a salary range between $37,000.00 and $45,000.00 per year." (Pl.'s Ex. 19A and 19B). The court finds such testimony speculative in nature. See Trustmark Ins. Co. v. General & Cologne Life Re of America, 424 F.3d 542, 553-54 (7th Cir. 2005). There is no evidence in the record that suggests with reasonable certainty that Lamb would have actually hired Bennett, or that he even offered him a position. Lamb mere's statement that "he anticipated that Don Bennett would come to work for him full time after he recuperated. . . ." is lacking in foundation and does not establish with reasonable certainty that Lamb would have in fact given Bennett a job. See id.

### III. CONCLUSION

The court finds that Dr. Ondra was negligent in the operation of the first surgery, and awards Plaintiff damages in the amount of $ 373,361.81. The court rejects the Government's suggestion of $10,000.00 per month, of $60,000.00 for the amount of time between the two surgeries.


ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court


DATED: _2/24/06_

28